UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHAD RICHARD WORTMAN, | ) | CASE NO. 5:15CV558 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | Magistrate Judge George J. Limbert |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | REPORT AND RECOMMENDATION |
| ACTING COMMISSIONER OF | ) | OF MAGISTRATE JUDGE |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

Chad Richard Wortman ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. He has filed a motion for summary judgment in this case. ECF Dkt. #12. For the following reasons, the undersigned recommends that the Court DENY Plaintiff's motion for summary judgment (ECF Dkt. #12), but REVERSE the ALJ's decision and REMAND the instant case for the ALJ to reconsider, reevaluate, and further explain his analysis concerning the opinions of Dr. Johnston, Plaintiff's treating physician, Drs. Pakeeree and Robb, Plaintiff's treating psychiatrist, and Dr. Farrer, Plaintiff treating psychologist.

## I.    PROCEDURAL AND FACTUAL HISTORY

Plaintiff filed his applications for DIB and SSI on June 15, 2011 alleging disability beginning July 5, 2010 due to nerve damage of the right arm and leg and uncontrollable diarrhea and intestinal problems status post gunshot wound, back problems, insomnia, and anxiety. ECF Dkt. #8 ("Tr.") at 176-185, 211, 238. The SSA denied Plaintiff's applications initially and on reconsideration. *Id.* at 122-129, 132-151. Plaintiff requested an administrative hearing, and on August 22, 2013, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security, replacing Michael J. Astrue.

by counsel, and a vocational expert ("VE").  ECF Dkt. #9 at 1107-1108 ("Supp. Tr.").  On October 24, 2013, the ALJ issued a decision denying DIB and SSI.  *Id*. at 13-28.  Plaintiff appealed, and on January 21, 2015, the Appeals Council denied review.  *Id.* at 1-8.

On March 23, 2015, Plaintiff filed the instant suit seeking review of the ALJ's decision.  ECF Dkt. #1.  On July 10, 2015, Plaintiff, through counsel, filed a motion for summary judgment and a brief on the merits.  ECF Dkt. #s 12, 13. On October 8, 2015, Defendant filed a brief on the merits.  ECF Dkt. #18.  On October 21, 2015, Plaintiff filed a reply brief.  ECF Dkt. #19.

## II.    SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

On October 24, 2013, the ALJ issued a decision finding that Plaintiff suffered from status post gunshot wound to the right hip, right forearm and abdomen; irritable bowel syndrome ("IBS"); pernicious anemia; posttraumatic stress disorder ("PTSD") ; and major depressive disorder, which qualified as severe impairments under 20 C.F.R. §§ 404.1520(c) and 416.920(c). Tr. at 15.  The ALJ further determined that Plaintiff's impairments, individually and in combination, did not meet or equal any of the Listings.  *Id*. at 16-18.

The ALJ proceeded to find that Plaintiff had the RFC to perform light work except that he could not climb ladders, ropes or scaffolds; but he could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl, understand, remember and carry out simple, routine tasks; he could perform low-stress work defined as work not subjecting him to strict quotas or fast-paced high production demands or work not requiring negotiation, arbitration, confrontation, directing the work of others or being responsible for the work of others; he could adjust to only infrequent workplace changes and he could only superficially interact with the public and occasionally interact with co-workers. Tr. at 18-26.  Based upon this RFC and the testimony of the VE, the ALJ concluded that Plaintiff could not perform his past relevant work, but he could perform jobs existing in significant numbers in the national economy, including the representative occupations of a mail clerk, cafeteria worker and packager.  *Id*. at 27.  Consequently, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and he was not entitled to DIB or SSI.  *Id.* at 27-28.

### III.  STEPS FOR ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits.  These steps are:

1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.  An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.  If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.  If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### IV.  STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## V.     RELEVANT MEDICAL HISTORY AND TESTIMONY

### A.     MEDICAL HISTORY

On July 4, 2010, Plaintiff was transported to the emergency room after suffering a gunshot wound from a sawed-off shotgun while at a friend's house. Tr. at 332. Plaintiff related that he was sitting on a porch at his friend's house when he was shot in the right upper leg and his right arm. *Id*. The operative report showed diagnoses of:  shotgun wound to the right groin with entrance into the abdomen with missile penetration into the abdomen with multiple enterotomies and ileum and wide open sport of the cecum with fecal contamination; and gunshot wound to skin soft tissue and muscle of the right forearm. *Id*. at 345. A pelvis CT showed gunshot pellets throughout with no acute bony injuries. *Id*. at 366. A right forearm CT showed numerous metallic bullet fragments with soft tissue irregularity in the right forearm. *Id*. at 367. A lower abdominal and pelvis CT showed multiple bullet fragments in the lower abdomen and pelvis, vascular injury to the right external iliac artery and vein, evidence of free peritoneal air suggesting a bowel perforation, bullet fragments in the bowel and urinary bladder, and a small hematoma in the right psoas muscle and right pelvis. *Id*. at 366, 370.

Plaintiff underwent an exploratory laparatomy, ileocecectomy, resection of nearly the entire ileum, ileocolic staples anastomsis, closure of the peritoneum at the entrance site, incision and drainage of the entrance wound to the right groin, and incision and drainage with closure over a penrose of the right forearm gunshot wound. Tr. at 345. The final diagnoses were small bowel resection with cecectomy-three hemorrhagic transmural defects of the small bowel and a single hermorrhagic transmural defect of the cecum consistent with gunshot wounds. *Id*. at 349. Plaintiff was hospitalized until July 12, 2010 and Plaintiff's surgeon, Dr. Muakkassa, advised that Plaintiff lift no more than 5-10 pounds for at least two weeks and follow-up with wound care and surgery clinic. *Id.* at 351-352. He noted that by July 11, 2010, Plaintiff was tolerating a regular diet, having bowel function and was doing well. *Id*. at 351. The record shows that on July 19, 2010, Plaintiff's right arm wound was healed, sutures were removed, and his abdominal wound was healing well. *Id*. at 446. The groin wound was still being packed and Plaintiff indicated that his pain was at a 10 on a pain scale, with 10 being the worst pain. *Id.* at 447.

Plaintiff followed up at Akron General Medical Center complaining of abdominal pain. Tr. at 576. It was noted that the wounds were healing well. *Id*. July 21, 2010 notes from the wound center indicate that Plaintiff was in no acute distress, and he underwent excisional debridement of his wounds with chemical cautery. *Id*. at 318. He was advised to apply Bacitracin twice daily and dry gauze to his right forearm, apply Silvadene and Mesalt once daily to his right hip wound, and apply Mesale once daily to his abdominal wound. *Id*. Plaintiff was also advised to continue with good protein and fluid intake and to start a multivitamin. *Id*.

On August 4, 2010, Plaintiff followed up with Dr. McNatt at the wound center. Tr. at 377. He rated his pain as 5-6 out of 10 and he was using Percocet to control his pain. *Id*. He also used four medications for his right hip, forearm and abdominal wounds and Dr. McNatt observed that those wounds had improved. *Id*.

Plaintiff presented to the emergency room on August 23, 2010 for his abdominal pain. Tr. at 820. Examination was normal except for mild diffuse tenderness to palpation and the diagnosis was chronic abdominal pain post gunshot wound. *Id*. at 821. He was prescribed Percocet. *Id.*

On August 26, 2010, Plaintiff met with Dr. McNatt, who noted that Plaintiff was in no acute distress and his abdominal and right forearm wounds were healed.  Tr. at 321, 375.  Plaintiff reported occasional diarrhea and abdominal and forearm pains.  *Id.*  Dr. McNatt noted that Plaintiff still had "BBs present in the right forearm, questionable one in the right hip area and abdomen as well."  *Id.*  Dr. McNatt assessed resolved abdominal and right arm wounds, a right hip wound, and status post gunshot wound.  *Id.* He discontinued two of the three medications that Plaintiff was using on his right hip, gave Plaintiff a prescription for Percocet, and told him to keep his appointments with his surgeon, pain management doctor and his next wound center reevaluation.  *Id.*

On September 15, 2010, Plaintiff followed up with Dr. McNatt, who noted that Plaintiff still had an open wound on his right hip and Plaintiff reported that he was still having significant pain from underlying "BB's" that were still lodged in his skin.  *Id.*  Plaintiff indicated that he had seen his surgeon who had released him to go back to work.  *Id.* at 322, 376.  Dr. McNatt assessed a healed open wound to the right hip, resolved abdominal and right arm wounds, and status post gunshot wound.  *Id.*  He advised Plaintiff to keep the wound areas covered, discharged Plaintiff from the wound center, and indicated that Plaintiff could return to work as tolerated.  *Id.*

On October 5, 2010, Dr. Muakkassa completed a basic medical form opining that Plaintiff could stand/walk for only fifteen to twenty minutes for only fifteen to twenty minutes at a time.  Tr. at 421.  He further opined that Plaintiff could sit for only one hour per day for one hour at a time, he could lift up to five pounds occasionally and frequently, and he was extremely limited in pushing/pulling and bending, markedly limited in reaching and handling, and not limited in seeing, hearing or speaking.  *Id.*  Dr. Muakkassa identified Plaintiff's gunshot wounds as the medical evidence supporting his conclusions and he opined that Plaintiff's limitations would last or be expected to last for a period of twelve months or more.  *Id.*

On this same date, Dr. Burick, Plaintiff's primary care physicians, wrote a note indicating that Plaintiff was unable to maintain gainful employment.  Tr. at 424, 426.  Dr. Burick's progress notes are mostly illegible, but an October 26, 2010 note indicated that Plaintiff had pain and stiffness and weakness in his right arm and leg.  *Id.* at 433.

-6-

On February 10, 2011, Plaintiff underwent an excision and removal of retained foreign body of bird shot (metallic pellets) from his right forearm and groin.  Tr. at 328, 450.  Dr. Fenton, the surgeon, noted that Plaintiff had been shot in the right forearm and into the right groin with a shotgun with bird shot over the past summer and bird shot remained in his forearm and groin.  *Id.* Fourteen pellets were removed from Plaintiff's right forearm and two from his right groin.  *Id.* at 329.

On February 23, 2011, Plaintiff followed up with family physician Dr. Burick for his gunshot wounds and explained that he had 13 BBs removed from "another accident with a BB gun."  Tr. at 512, 524, 582.  It was noted that Plaintiff had been shot with a sawed-off pump shotgun the past year and he was very somatic and stated that he was in so much pain that he could not sleep, work or even move.  *Id.*  Plaintiff related that he was going to see a psychiatrist.  *Id.*   Dr. Burick's examination indicated that Plaintiff's wounds were well-healed with scar tissue of the right forearm from where BBs were removed and scars of the abdomen and right hip that were unchanged.  *Id.* Plaintiff moaned in pain when Dr. Burick tried to move his right lower extremity or left upper arm. *Id.*

On March 28, 2011, Plaintiff presented to Dr. Burick complaining of abdominal pain.  Tr. at 510, 530.  Plaintiff indicated that he was constantly in pain and he could not work.  *Id.*  Upon examination, Dr. Burick noted multiple scar tissue and surgical scars on Plaintiff's abdomen with Plaintiff complaining of quite severe pain left of the central surgical excision.  *Id.*  However, Dr. Burick indicated that Plaintiff's pain "appears to be out of proportion to my physical findings."  *Id.* He ordered imaging of Plaintiff's abdomen.  *Id.*

On April 8, 2011, Plaintiff presented to Dr. Adury of Greater Akron Psychiatry complaining of depression.  Tr. at 592.  He related that he was applying for disability benefits.  *Id.*  He described the shotgun incident, indicating that it was an accidental shooting by a friend.  *Id.*  He complained of abdomen, thigh and forearm pain, ad well as flashbacks and nightmares of the incident.  *Id.*  He noted sleep problems, depression and passive suicidal thoughts.  *Id.*  He related that after the shooting, he overdosed on 6-7 Percocet pills.  *Id.*  He stated that he also suffered from panic attacks

-7-

in situations that reminded him of the shooting and he heard voices and saw dark shadows.  *Id*.  He also indicated having problems with nausea and diarrhea ever since his surgery.  *Id*. at 593.

Upon examination, Dr. Adury noted that Plaintiff was in distress, made poor eye contact, had slow speech, a depressed mood and a restricted affect.  Tr. at 593.  Dr. Adury found that Plaintiff had a negative thought process.  *Id*.  Dr. Adury noted that Plaintiff's vague  hallucinations did not appear to be psychotic in nature and his passive suicidal thoughts were without an active plan or intent.  *Id*.  Dr. Adury found Plaintiff's attention and concentration were poor to fair, but his memory was grossly intact, his fund of knowledge was average and his insight and judgment were fair.  *Id.* Dr. Adury diagnosed PTSD, severe major depressive disorder without psychotic features, insomnia due to a mental disorder, and sought to rule out chronic pain with psychological factors and general medical condition.  *Id*.  Dr. Adury rated Plaintiff's global assessment of functioning as 50, indicative of serious symptoms.  *Id*.  Dr. Adury summarized that Plaintiff's depression started after his gunshot injury, which lead to PTSD, and he had low self-esteem and poor coping skills which could contribute to worsening his current symptoms. *Id.* at 594.  Dr. Adury prescribed Remeron, continued the Klonopin that Plaintiff had been taking, and recommended that Plaintiff participate in a partial hospitalization or day treatment program and regular counseling.  *Id*.

On June 7, 2011, Plaintiff presented to Dr. Lababidi for his abdomen, right arm and right hip/thigh area pain.  Tr. at 597.  Upon examination, Dr. Lababidi found that Plaintiff was in no acute distress, had tenderness in trigger points of his abdomen, positive Carnett's signs, a normal range of motion, palpation of the cervical muscles, normal spine inspection, palpation tenderness to the paravertebral muscles, palpable and intact extremities pulses, and a normal neurologic examination. *Id.* at 598.  He assessed abdominal pain at an unspecified site, muscle spasm/spasticity, PTSD, neuralgia, neuritis and/or radiculitis, neck pain/cervicalgia, and lumbago.  *Id*.  He discontinued many of Plaintiff's medications for his stomach pain and in particular stopped Gabapentin and Percocet. *Id*.  He expressed that he was concerned about Plaintiff "as he was all over during the interview and not making a lot of sense."  *Id*.  He started Plaintiff on Lyrica and Opana and scheduled him for a trigger point injection for abdominal muscle spasms*.  Id*.  He also ordered a urine drug screen and

indicated that he would consider sending Plaintiff to an addiction specialist if he noticed a certain behavior. *Id.* at 599.

On June 21, 2011, Plaintiff presented to Dr. Lababidi for his abdominal wall pain. Tr. at 595. Dr. Lababidi gave Plaintiff trigger point injections into the abdominal wall. *Id.* On June 23, 2011, Dr. Lababidi was sent a letter from the agency requesting a medical report or copies of his medical records concerning Plaintiff to include Plaintiff's medical history, Dr. Lababidi's objective findings, diagnoses, prognoses, treatments and responses to treatments, and Plaintiff's work-related functional limitations. *Id.* at 602. Dr. Labadidi responded with a stamp on the agency form indicating that he does not determine disability and Plaintiff's medical records would be the only documents sent. *Id.* He did note that he first saw Plaintiff on June 7, 2011 and last saw him on June 21, 2011. *Id.* at 603.

On July 6, 2011, Plaintiff presented to the pain management clinic and saw Dr. Griffiths. Tr. at 613. She noted his complaints of pain and mental issues and his assertion that the trigger point injections helped after 48 hours. *Id.* Plaintiff reported headaches, dizziness and loss of balance, heartburn, abdominal pain, diarrhea, nausea and vomiting, muscle pain, neck pain, back pain, joint pain and stiffness, muscle cramps, trouble concentrating, numbness and weakness, excessive thirst, lumps and swelling, feeling depressed, and trouble sleeping. *Id.* at 614. Physical examination showed no acute distress, abdomen tenderness and trigger points in his abdomen, positive Carnett's sign, normal range of motion and palpation of the cervical muscles, normal spine inspection, palpation tenderness to the paravertebral muscles in the lumbar spine and palpable and intact extremities pulses, and a normal neurologic examination. *Id.* She found his gait antalgic. *Id.* at 615. She assessed abdominal pain at an unspecified site, muscle spasm/spasticity, PTSD, neuralgia, neuritis and/or radiculitis, neck pain/cervicalgia, and lumbago. *Id.* Dr. Griffiths refilled the Lyrica and Opana ER, ordered another trigger point injection, and indicated that she would consider sending Plaintiff to an addiction specialist if she noticed a certain behavior. *Id.*

On July 8, 2011, Dr. Johnston wrote a letter to Plaintiff's social security counsel indicating that he first saw Plaintiff on July 8, 2011 for his complaints of abdominal pain, nausea, vomiting, diarrhea and reflux stemming from being shot in the right arm, stomach and groin on July 4, 2010. Tr. at 605, 857. Dr. Johnston indicated that Plaintiff had undergone abdominal surgery with a partial

-9-

bowel resection and right arm surgery. *Id.* He diagnosed Plaintiff with abdominal pain, pain in the forearm joint, lower leg pain in soft limb tissue, unspecified neuralgia, neuritis and radiculitis, and dumping syndrome. *Id.* He indicated that Plaintiff was also in pain management and seeing a psychiatrist for anxiety, depression and PTSD. *Id.* He identified Plaintiff's medications as Opana, Flexeril, and Lyrica for pain management, Paxil, Depakote ER and Clonazepam for psychiatric treatment, and Nexium, Edgic, Bentyl and B-12 injections for Plaintiff's treatment with him. *Id.* at 606. Dr. Johnston noted that Plaintiff saw him every 1-2 months and the side effects of Plaintiff's medications included somnolence and insomnia. *Id.* As to the limits on Plaintiff's activities, Dr. Johnston indicated that Plaintiff was in constant pain and he had dumping syndrome which caused diarrhea right after eating due to the bowel resection surgery. *Id.* Dr. Johnston also noted Plaintiff's depression and anxiety due to an inability to work and lead a normal life. *Id.* He indicated that Plaintiff's right thigh pain caused pain with steps and walking, caused his leg to give out, and his right arm pain restricted limiting, pushing, pulling and lifting. *Id.* He opined that Plaintiff's prognosis was poor and his disability would exceed 12 months. *Id.*

Plaintiff underwent a trigger point injection to his abdominal wall on July 18, 2011 from Dr. Lababidi. Tr. at 611.

Plaintiff had a B-12 injections on July 22, 2011 and July 16, 2011 and Dr. Johnston refilled his prescriptions. Tr. at 626-628, 852-855. Upon examination, he found that Plaintiff was alert and oriented, in no acute distress, but he reported having diarrhea and his abdomen was tender to palpation. *Id.* at 626.

On August 1, 2011, Plaintiff presented to Dr. Lababidi for his back, chest, abdominal, knee and neck pain. Tr. at 608. Plaintiff requested an increase in his medications. *Id.* Upon examination, Dr. Lababidi found that Plaintiff was in no acute distress, he had tenderness in trigger points of his abdomen, positive Carnett's signs, normal range of motion and palpation of the cervical muscles and in the thoracic spine normal spine inspection, but palpation tenderness to the paravertebral muscles in the lumbar spine, and a normal neurologic examination. *Id.* at 609. He assessed abdominal pain at an unspecified site, muscle spasm/spasticity, PTSD and neuralgia, neuritis and/or radiculitis. *Id.* Dr. Lababidi refilled the Lyrica and Opana ER medications and performed a trigger point injection

-10-

over the abdomen.  *Id*.  Dr. Lababidi again noted that he would consider sending Plaintiff to an addiction specialist if he noticed a certain behavior, but Plaintiff did not want such an appointment and indicated that he did not have a problem.  *Id*.  Dr. Lababidi noted that Plaintiff had run out of Opana ER due to self-medicating and he ordered a drug screen.  *Id*.

On August 15, 2011, Dr. McMillen, D.C., Plaintiff's chiropractor, completed an agency form indicating that Plaintiff had curvature of the lumbar and thoracic spine, neck pain rated as 3 out of 10, mid back pain rated as 6 out of 10, and low back pain rated as 5 out of 10.  Tr. at 620.  He noted that Plaintiff had limited motion in his joints and/or spine and he had slow and deliberate fine and gross manipulation abilities as he could fine manipulations such as playing video games, but should be limited to gross manipulation of no more than 30 pounds.  *Id*.  Dr. McMillen indicated that Plaintiff had a normal gait, had his symptoms since he was shot in 2010, and treatment had relieved some of the symptoms.  *Id*.  When asked if Plaintiff could use his extremities to perform functional tasks, Dr. McMillen responded that he could.  *Id*.  Dr. McMillen's progress notes are included in the record and show muscle spasms in the neck, thoracic area, and lower back.  *Id*. at 634-648.  The notes also show the treatment modalities, various ranges of motion and varying degrees of progress and setbacks for Plaintiff.  *Id*.

On August 30, 2011, Plaintiff presented to Dr. Johnston.  Tr. at 624, 850.  Dr. Johnston diagnosed pernicious anemia, IBS, esophageal reflux and flat foot.  *Id*.  He noted upon examination that Plaintiff was in no acute distress, and was oriented and stable.  *Id*.  He refilled Plaintiff's anemia medication, and his Remeron and Clonazepam.  *Id*.  He also gave Plaintiff a B-12 injection.  *Id*.

On September 27, 2011, Plaintiff presented to Dr. Johnston stating that his anxiety was improving, but his depression was worsening and medications were only mildly beneficial.  Tr. at 549, 848.  He indicated that he was generally able to perform his usual activities.  *Id*.  Dr. Burick's physical examination showed that he was alert and oriented, had a normal neurologic exam and had a normal affect, made good eye contact, appeared stable, but showed some anger.  *Id*.  Dr. Burick diagnosed depressive disorder, not otherwise specified, generalized anxiety disorder ("GAD"), and IBS.  *Id*.  He referred Plaintiff for psychiatric help and gave him a B-12 injection.  *Id*. at 550.

-11-

Also on September 27, 2011, Plaintiff presented to Dr. Lababidi for pain management.  Tr. at 675.  Upon examination, Dr. Lababidi found that Plaintiff was in no acute distress, he had tenderness in trigger points of his abdomen, positive Carnett's signs, normal range of motion, palpation of the cervical muscles and in the thoracic spine, normal spine inspection, palpation tenderness to the paravertebral muscles in the lumbar spine, and a normal neurologic examination. *Id.* at 676.  He assessed abdominal pain at an unspecified site, muscle spasm/spasticity, PTSD, neuralgia, neuritis and/or radiculitis and myofascial or muscle pain.  *Id.*  Dr. Lababidi refilled Lyrica, Opana ER, Voltaren Gel, and started Plaintiff on Esgic for headaches.  Abnormal results were noted from Plaintiff's August 1, 2011 drug screen.  *Id.* at 675.  Dr. Lababidi again noted that he would consider sending Plaintiff to an addiction specialist, but Plaintiff declined, indicating that he did not have a problem.  *Id.* at 676.  Dr. Lababidi noted that Plaintiff's drug screen was inconsistent concerning the Opana ER.  *Id.*

On November 8, 2011, Plaintiff presented with his mother to Dr. Pakeeree for a psychiatric evaluation. Tr. at 865.  He complained of anxiety, depression, insomnia, forgetting things and irritability since the shooting.  *Id.*  He also indicated that he had nightmares since the incident, and diarrhea, acid reflux and right arm weakness and pain.  *Id.*      Dr. Pakeeree's examination noted that Plaintiff had an anxious and depressed mood, increased psychomotor activity, pressured speech, but no delusions, hallucinations, or suicidal or homicidal ideations. Tr. at 866.  No objective memory difficulties were noted and Plaintiff's insight and judgment were fair.  *Id.*  She diagnosed Plaintiff with PTSD and major recurrent depression secondary to his medical conditions and rated his GAF at 60.  *Id.* She prescribed Paxil, continued Remeron, and recommended therapy.  *Id.* at 866-867.

Plaintiff presented to Dr. Pakeeree on November 22, 2011 for follow-up on medication management and psychotherapy.  Tr. at 864.  Plaintiff reported still feeling anxious and depressed, was sleeping fairly, and while not having mood swings, he became angry frequently.  *Id.*  Dr. Pakeeree noted that Plaintiff's mood and affect were appropriate, he had normal psychomotor activity, and she continued Paxil and Remeron, prescribed Depakote ER and Klonopin, and recommended continuing psychotherapy.  *Id.*

-12-

On November 23, 2011, Plaintiff met with Dr. Lababidi and reported that he was vomiting all day.  Tr. at 668, 698.  He had circled "suicidal thoughts" on a form that he completed.  *Id*.  After examining him, Dr. Lababidi discussed the inconsistent drug screens which were negative for Opana and he told Plaintiff that if it continued, he would be discharged.  *Id.* at 669.  Plaintiff indicated that his parents give him his medications and he was short on pills.  *Id*.  He was referred for addiction counseling and ordered to have a pill count in two weeks and a urine drug screen.  *Id*.

On December 5, 2011, Dr. Pakeeree wrote a note indicating that Plaintiff was unable to work because of his physical and mental disabilities.  Tr. at 649-651.

On December 7, 2011, Plaintiff presented to Dr. Lababidi for a trigger point injection in the right trapezium area.  Tr. at 666, 696.  Plaintiff also had to undergo a pill count, but he stated that he had no access to the medications as they were locked in a safe and he was working over and only his dad had the key.  *Id*.

On December 8, 2011, Plaintiff presented to Dr. Johnston to refill his B-12, discuss his stomachaches and complaints of diarrhea, and to discuss SSI.  Tr. at 547, 741, 846.  Dr. Johnston indicated that Plaintiff's anxiety and depression were stable, and he noted that Plaintiff was generally able to do his usual activities.  *Id*.

On December 20, 2011, Dr. Johnston wrote a "To whom it may concern" letter indicating that Plaintiff had been a patient for several years and would not be able to return to work for a period of 6 to 12 months due to anxiety, depression, right arm pain and weakness due to gunshot wound and surgery, and due to IBS or dumping syndrome from a bowel resection also due to a gunshot wound.  Tr. at 653.  He stated that Plaintiff would not be able to return to work for at least a year. *Id.*

On December 20, 2011, Plaintiff presented to Dr. Pakeeree and reported that he was having problems sleeping, was argumentative and had mood swings.  Tr. at 863.  Dr. Pakeeree noted Plaintiff's mood and affect were appropriate and his insight and judgment were good.  *Id*.

On December 21, 2011, Plaintiff presented to Dr. Lababidi who noted that Plaintiff had an appointment for addiction counseling on December 29, 2011.  Tr. at 692.  Upon examination, Dr. Lababidi found that Plaintiff was in no acute distress, he had tenderness in trigger points of his

-13-

abdomen, positive Carnett's signs, normal range of motion and palpation of the cervical muscles and in the thoracic spine, normal spine inspection, but palpation tenderness to the paravertebral muscles in the lumbar spine, and a normal neurologic examination. *Id.* at 693. He assessed abdominal pain at an unspecified site, muscle spasm/spasticity, PTSD, neuralgia, neuritis and/or radiculitis and myofascial or muscle pain. *Id.* Dr. Lababidi noted that Plaintiff's August 2011 urine drug screen was consistent for Opana but showed Morphine and Percocet and his November 2011 drug screen showed Lyrica but was inconsistent for Opana. *Id.* Plaintiff's June 2011 drug screen was negative for the parent drug and showed a metabolite for Percocet. *Id.* Dr. Lababidi refilled Lyrica, Opana ER, Voltaren Gel, and Esgic. A drug screen was ordered. *Id.* at 694. Dr. Lababidi noted that he would no longer prescribe narcotics to Plaintiff. *Id.*

On December 29, 2011, Plaintiff presented to Dr. Lababidi for evaluation at the pain management clinic. Tr. at 659, 689. Dr. Lababadi noted inconsistencies in some of Plaintiff's previous urine screens and Plaintiff had run out of medications and missed a pill count with the practice. *Id.* Dr. Lababidi noted that Plaintiff was moderately depressed and seeing a psychiatrist and psychologist for "anger and PTSD." *Id.* He also noted that Plaintiff was under considerable financial strain and had a past history of arrests. *Id.* Upon examination, Dr. Lababadi found that Plaintiff was anxious with a flat expression, steady eye contact, appropriate speech and behavior, recent intact memory, normal affect, and intact judgment and average intellect. *Id.* at 660. He also noted that Plaintiff was evasive and erratic during the interview and he was a poor historian and was circumstantial and tangential in his reports. *Id.*

On January 18, 2012, Plaintiff presented to Dr. Lababidi complaining of chest, back, neck, abdominal, right groin, and right knee pain. Tr. at 656, 687. Dr. Lababidi noted that Plaintiff had been shot with a BB gun numerous times, although he also noted that Plaintiff had the pains since July 4, 2010, the date of the shotgun incident. *Id.* Plaintiff indicated that the pain was stabbing, throbbing, sharp, aching, tingling, numbing and radiating and bending, standing and sitting for a long time and activity made his pain worse. *Id.* Plaintiff reported that trigger point injections only help for one week and he experienced less than 50% relief with them. *Id.* Dr. Lababidi noted that Plaintiff was receiving counseling, he had been off of his medications for 2-3 weeks, and he was

-14-

complaining of severe pain and the inability to sleep. *Id.* Upon examination, Plaintiff was in no acute distress and was able to rise from a seated position easily. *Id.* He had tenderness at trigger points in his abdomen and positive Carnett's sign, normal cervical and thoracic spine exams, and normal range of lumbar spine motion, but palpation tenderness in the paravertebral muscles. *Id.* at 657. Plaintiff had a normal musculoskeletal exam and normal extremities, as well as a normal neurologic exam but for an antalgic gait. *Id.* Dr. Lababidi assessed abdominal pain at an unspecified site, myofascial or muscle pain, muscle spasm/spasticity, PTSD, and neuralgia/neuritis or radiculitis. *Id.* He discontinued Plaintiff's Opana, indicating that Plaintiff was requesting narcotics and was very argumentative as Dr. Lababidi made clear at the last visit that Plaintiff would not be getting narcotics from him. *Id.* It was noted that the conversation lasted over 45 minutes and Dr. Lababidi told Plaintiff and his mother that he had to learn to manage his pain without narcotics. *Id.* He ordered a consult with pain management for Plaintiff, trigger point injections and continued his Lyrica and Lidoderm patches. *Id.* at 658.

On January 27, 2012, Plaintiff followed up with Dr. Johnston for a new referral to pain management. Tr. at 545, 739, 844. Dr. Johnston noted that Plaintiff's anxiety was stable and his depression was stable with medications that provided a significant benefit. *Id.* Upon examination, Dr. Johnston found Plaintiff to be alert and oriented, with a normal neurologic examination and a normal affect with good eye contact. *Id.* Dr. Johnston diagnosed Plaintiff with depressive disorder not otherwise classified, generalized anxiety disorder ("GAD"), IBS and anemia of other chronic disease. *Id.* He refilled Plaintiff's medications for depression, referred him to a gastroenterologist and started him on other medications. *Id.* at 546.

On February 8, 2012, Plaintiff presented to Dr. Narouze for a consultation on pain management. Tr. at 736, 769, 779, 840. He examined Plaintiff and assessed abdominal pain, forearm and lower leg pain, limb tissue pain and unspecified neuralgia, neuritis and radiculitis. *Id.* He started Plaintiff on Lyrica and Percocet, prescribed Lidoderm patches and gave him a trigger point injection to the abdominal wall. *Id.*

On February 22, 2012, Plaintiff met with Dr. Sipps, Ph.D. for an evaluation concerning his anxiety and depression. Tr. at 806, 870. Upon examination and Plaintiff's completion of

questionnaires, Dr. Sipps diagnosed Plaintiff with PTSD and rated Plaintiff's GAF at 52, indicative of moderate symptoms.  *Id.* at 808.  Dr. Sipps recommended stress management intervention and that Plaintiff continue treating with Dr. Pakeeree.  *Id.*  He gave Plaintiff a relaxation CD.  *Id.*

Dr. McMillen completed an agency form indicating that he first saw Plaintiff on October 17, 2008 and last saw him on February 23, 2012.  Tr. at 723.  He diagnosed Plaintiff with thoracic and cervical nerve root lesions, sprain and myalgia.  *Id.*  He indicated that Plaintiff had severe middle back pain, headaches, and neck pain at the initial examination on October 17, 2008 and since being shot in July of 2010, he had ups and downs in his symptoms.  *Id.*  He described his medical findings and treatments and indicated that compliance was an issue as Plaintiff had missed several appointments.  *Id.* at 724.  In describing Plaintiff's limitations, Dr. McMillen wrote that Plaintiff had trouble and increased pain when sitting and standing, trouble sleeping, and Plaintiff reported that his neck and back hurt when he played video games.  *Id.*  Dr. McMillen's progress notes are located throughout the record.  *Id.* at 980-998.

On February 27, 2012, Dr. Labadidi completed an agency form requesting that he provide medical records or a medical report concerning Plaintiff's request for reconsideration of disability based upon nerve damage to his right arm and leg, back problems, anxiety, insomnia and intestinal problems.  Tr. at 683.  He responded with the stamp on the form indicating that he does not determine disability and Plaintiff's medical records would be the only documents sent.  *Id.* at 684-685.  He indicated that he first saw Plaintiff on June 7, 2011 and last saw him on January 18, 2012.  *Id.* at 684.

Dr. Pakeeree completed an agency form on February 27, 2012 indicating that Plaintiff had anxiety, depression and irritability, but he did not have a cognitive impairment.  Tr. at 727.  She diagnosed Plaintiff with major depression secondary to his medical condition.  *Id.* at 728.  She opined that Plaintiff had trouble with concentration and poor frustration tolerance and this and his chronic severe pain restricted his daily living activities and social interactions.  *Id.*  She noted that Plaintiff's symptoms had persisted for 20 months and the symptoms were somewhat responsive to treatment.  *Id.* at 728.  Plaintiff was compliant with medications and appointments and Dr. Pakeeree opined that Plaintiff would have difficulty tolerating routine daily and workplace stress.  *Id.*

-16-

On March 1, 2012, Plaintiff presented to Dr. Johnston for pain management. Tr. at 730, 838. Examination revealed no acute distress, non-tender abdomen, scarring consistent with reported injury at the right arm, abdomen and right groin. *Id*. at 731. Plaintiff had normal sensation, motor skills, and rotation, normal strength in the upper and lower extremities and no new neurologic deficits. *Id*. Plaintiff had no back pain, adequate cervical and lumbosacral ranges of motion, and a variable, depressed, anxious affect. *Id*. Dr. Johnston diagnosed abdominal pain at an unspecified site, forearm and lower leg joint pain, pain in soft tissues of the limb and unspecified neuralgia, neuritis and radiculitis. *Id*. at 732. Dr. Johnston gave him a trigger point injection to the abdominal wall. *Id.* at 734.

Plaintiff followed up with Dr. Pakeeree on March 6, 2012 and reported that the combination of medications that he was on was helping. Tr. at 862. He indicated that he still had chronic pain, but was also taking Percocet and getting pain management. *Id*. Plaintiff's mood and affect were appropriate and his insight and judgment were good. *Id*.

On March 6, 2012, Dr. McMillen completed a questionnaire form regarding Plaintiff's reconsideration of his social security claim by the agency. Tr. at 968.

On March 8, 2012, Plaintiff presented to Dr. Johnston. Tr. at 541, 730, 837. Upon examination, Dr. Johnston found that Plaintiff was in no acute distress, he had right arm scarring consistent with his gunshot wound and surgery, a non-tender abdomen with scarring consistent with gunshot wound and surgery, and right groin scarring. *Id.* He noted that Plaintiff had normal motor skills, normal sensation and rotation, normal strength in the upper and lower extremities, no new neurological deficits, no back pain, adequate cervical and lumbosacral ranges of motion, and a variable depressed and anxious affect. *Id.* Dr. Johnston diagnosed abdominal pain at an unspecified site, forearm and lower leg joint pains, pain in soft limb tissues, and unspecified neuralgia, neuritis and radiculitis. *Id*. He referred Plaintiff to pain management. *Id.* at 542.

On March 9, 2012, Plaintiff followed up with Dr. Sipps, Ph.D. Tr. at 772, 777. He found Plaintiff to be oriented, with good eye contact, a pleasant demeanor and desultory speech. *Id*. Plaintiff reported that he was benefitting from Gingko Biloba for his memory, Voltaren gel for his

pain, the TENS unit, a microwave heating pad, and listening to relaxation CDs. *Id.* They discussed overall pain management approaches. *Id.*

On March 19, 2012, Plaintiff had a trigger point injection to his abdomen. Tr. at 759, 783.

Plaintiff followed up with Dr. Sipps for pain management on March 19, 2012 as well. Tr. at 775. He found that Plaintiff was oriented, with intermittent eye contact, a pleasant demeanor and very desultory speech. *Id.* Dr. Sipps indicated that Plaintiff had "difficulty maintaining a thread" and disclosed his drug abuse history and carrying a gun as a "body guard." *Id.* Plaintiff also reported that his family wanted to come in with him in order to have an intervention for him, but Dr. Sipps indicated that he would not have an intervention. *Id.* They discussed overall pain management approaches and Plaintiff indicated his desire for an increase in opiate medication. *Id.*

On March 28, 2012, Plaintiff presented to Dr. Burick and complained of abdominal pain. Tr. at 531. Dr. Burick assessed generalized abdominal pain and ordered abdomen scans. *Id.* at 532.

Plaintiff underwent a trigger point injection on April 3, 2012 for his abdominal wall pain. Tr. at 795. He reported that the last injection gave him only short term relief, but he indicated that his shoulder and upper back pain were giving him the most pain currently. *Id.*

On April 5, 2012, Dr. Bandi, a gastroenterologist evaluated Plaintiff for his persistent diarrhea and right lower quadrant pains. Tr. at 977. She diagnosed chronic abdominal pain and diarrhea probably secondary to the bowel resection. *Id.* She ordered an upper GI examination and small bowel series. Tr. at 826. No abnormality was identified in the upper GI tract. *Id.*

On May 1, 2012, Plaintiff followed up with Dr. Narouze and reported significant relief with the prior two trigger point injections. Tr. at 834. He also indicated that the increased dosage of Oxycodone was helping and he was more active. *Id.* Physical examination showed no abdominal pain, no joint pain, normal ranges of motion and strength, no muscle aches, weaknesses or tenderness and no anxiety, depression or mood swings. *Id.* at 834-835. Dr. Narouze diagnosed abdominal pain at an unspecified site, forearm and lower leg pain in the joints, pain in soft limb tissues, and unspecified neuralgia, neuritis and radiculitis. *Id.* He continued Plaintiff's Oxycodone and Lyrica and started him on Flexeril. *Id.* at 835.

-18-

Plaintiff presented to Dr. Pakeeree on May 4, 2012 for psychotherapy and medication management. Tr. at 861. Apparently, Plaintiff and his father had gotten into a physical altercation. *Id.* Dr. Pakeeree found that Plaintiff's mood and affect were appropriate and his insight and judgment were fair. *Id.* She provided supportive therapy and continued his medications. *Id.* at 862.

Dr. Bressi of Summit Pain Specialists evaluated Plaintiff on May 24, 2012 for his complaints of abdominal, right arm, right groin, leg, and rib pain. Tr. at 906. Plaintiff indicated that his pain level was 10 and the MS Contin and Roxicodone that he was taking were nowhere near as helpful as the Opana ER. *Id.* at 907. Plaintiff adamantly stressed that he did not smoke marijuana but a relative and her boyfriend who live in the same house smoked it so his drug test results showed positive results because of them. *Id.* Dr. Bressi examined Plaintiff and found that his abdomen was soft and tender diffusely radiating down into the right anterior thigh, with femoral nerve distribution, with sensory depression and loss and allodynia in the right anterior thigh and right forearm. *Id.* He discontinued the MS Contin and Roxocodone and restarted Plaintiff on Opana ER and Flexeril after diagnosing him with unspecified abdominal pain, neuralgia/neuritis/radiculitis and pernicious anemia. *Id.* at 908. Plaintiff had follow up examinations and July 24, 2012 progress notes indicate that the Opana ER, Flexeril and Lyrica were working appropriately to control his pain. *Id.* at 911.

May 25, 2012 small bowel series and upper GI films showed a few scattered metallic foreign bodies, especially in the right side of the pelvis. Tr. at 975.

On May 29, 2012, Dr. Bandi wrote a letter to Dr. Johnston stating that she evaluated Plaintiff for his chronic right lower abdominal pain and he had a small bowel series that was essentially unremarkable and a CT scan of his abdomen that showed IVC filter incidentally but otherwise was unremarkable. Tr. at 1009. She opined that Plaintiff's pain was related to his previous surgeries and adhesions and she recommended continuing him on Bentyle and Metamucil. *Id.*

On August 13, 2012, Dr. Johnston completed a multiple impairment questionnaire form stating that he began treating Plaintiff on July 8, 2011 and last examined him on July 17, 2012. Tr. at 874. He listed Plaintiff's diagnoses as PTSD, abdominal pain, IBS, pain in the lower leg and forearm joints, pain in soft limb tissues, unspecified neuralgia, neuritis and radiculitis, and anxiety and depression. *Id.* He described the clinical findings and laboratory and diagnostic test results that

-19-

supported his diagnoses, described Plaintiff's nature and location of his pain, and estimated that Plaintiff's pain and fatigue levels were 7-8 out of 10.  *Id*. at 876.  He indicated that he was unable to completely relieve Plaintiff's pain with medication without unacceptable side effects and he opined that Plaintiff could sit for up to four hours and stand/walk up to two hours per competitive five day workweeks on a sustained basis.  *Id*.  Dr. Johnston further opined that Plaintiff should not sit continuously in a work setting and should get up and move around every 15 minutes.  *Id*.  He indicated that Plaintiff could occasionally lift and carry up to ten pounds and could never lift more than that.  *Id*. at 877.  Dr. Johnston also noted significant limitations for Plaintiff in repetitive reaching, handling, fingering and lifting because of his right arm pain.  *Id*.  He opined that Plaintiff's symptoms would likely increase if he were placed in a competitive work environment and he would frequently experience pain, fatigue or other symptoms severe enough to interfere with his attention and concentration.  *Id*. at 879.  He also opined that Plaintiff's impairments would last at least 12 months, emotional factors would contribute to the severity of Plaintiff's limitations and symptoms, and Plaintiff would need to take unscheduled breaks to rest for thirty minutes to sixty minutes at unpredictable levels in an eight-hour workday.  *Id*.  Dr. Johnston further indicated that Plaintiff had all bad days, needed ready access to a bathroom, had psychological limitations, and could not push, pull or bend.  *Id*. at 880.

On August 27, 2012, Plaintiff underwent an initial psychological evaluation by Dr. Farrer, Ph.D. upon referral by Dr. Pakeeree because he was re-experiencing nightmares, flashbacks, unwanted thoughts, avoidance and hypervigilance related to the July 4, 2010 shooting.  Tr. at 883. He was diagnosed with PTSD, severe major depressive disorder without psychotic features, and polysubstance abuse in sustained remission.  *Id.* at 884.  His GAF was rated 50, indicative of severe symptoms.  *Id.*  Plaintiff thereafter began individual trauma therapy and sleep and nightmare ground therapy.  *Id*. at 886-904.

On September 12, 2012, Plaintiff presented to Dr. Bressi and related that on August 29, 2012, his right leg gave out and he fell down some stairs and fractured his right tibia, dislocated his right patella, chipped his left lateral ankle, and stretched some tendons.  Tr. at 914.  Plaintiff thought that he had blacked out.  *Id.*  He stated that his current pain medication regimen was not working

and he had run out of Percocet that was previously prescribed. *Id*. Dr. Bressi examined Plaintiff, continued his medications, and added a short course of Percocet. *Id*. at 915. Plaintiff returned to Dr. Bressi on November 7, 2012 and complained that he was released from the orthopedic surgeon and still had a bootcast on his right ankle, and the medication regimen was not working for his pain. *Id*. at 917. Dr. Bressi increased Plaintiff's Opana ER dosage. *Id*. at 918.

On November 15, 2012, Plaintiff presented to Dr. Robb for his PTSD, aggression and anxiety upon referral by Dr. Ferrar. Tr. at 921. Plaintiff reported anxiety symptoms with panic attacks and stated that he had trouble falling asleep, has nightmares, becomes extremely anxious about locking doors and leaves the lights on at night. *Id*. He stated that he was afraid that he would be shot again by the person who shot him before. *Id*. Dr. Robb found Plaintiff to be cooperative, with a steady gait, logical and normal speech, decreased recent and remote memory, average intelligence, no delusions or hallucinations, adequate judgment and good insight into his illness. *Id*. at 922. Dr. Robb diagnosed single episode major depressive disorder of moderate degree, panic disorder with agoraphobia and PTSD. *Id*. He prescribed Trazadone, Paxil, Xanax and Depakote ER. *Id*.

Dr. Johnston evaluated Plaintiff on December 3, 2012 and Plaintiff complained of fever, chills, weight loss, dizziness, ringing in his ears, changes in his bowel habits, indigestion, and pain with urination. Tr. at 1002. Upon examination, Dr. Johnston noted no motor or sensory deficit, appropriate mood and affect, and he diagnosed abdominal pain at an unspecified site, pain in the forearm and lower legs joints, pain in the soft limb tissues, unspecified neuralgia, neuritis and radiculitis, and IBS. *Id*. at 1003. He refilled Plaintiff's medications and prescribed a custom foot orthotic. *Id*.

On December 17, 2012, Dr. Ferrar completed a psychiatric/psychological impairment questionnaire indicating that she first treated Plaintiff on August 12, 2012 and last examined him on December 10, 2012 and met with him weekly. Tr. at 925. She diagnosed Plaintiff with PTSD, major depressive disorder without psychotic features, and polysubstance abuse in sustained full remission. *Id*. She indicated his current GAF and highest GAF in the past year at 50. *Id*. She check-marked the clinical findings of poor memory, sleep and mood disturbances, social withdrawal or isolation, decreased energy, recurrent panic attacks, anhedonia, intrusive recollections of a

-21-

traumatic experience, difficulty thinking or concentrating, hostility and irritability and suicidal ideation or attempts. *Id*. at 925-926. She listed Plaintiff's primary and most frequent and severe symptoms to be anger/irritability, memory problems and difficulty concentrating. *Id*. at 926-927. Dr. Ferrar opined that Plaintiff was mildly limited in understanding, remembering and carrying out one or two-step instructions and in performing activities within a schedule or maintaining regular attendance. *Id*. at 928-929. She found Plaintiff moderately limited in: understanding, remembering and carrying out detailed instructions; interacting appropriately with the general public; asking simple questions or requesting assistance; maintaining socially appropriate behaviors; and in responding appropriately to changes in the work setting. Dr. Ferrar found that Plaintiff was markedly limited in the areas of: maintaining concentration and attention for extended periods; sustaining an ordinary routine without supervision; working with others or close to them without being distracted by them; making simple work-related decisions; completing a normal workday or workweek without interruption from psychologically-based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; and in getting along with co-workers or peers without distracting them or exhibiting behavioral extremes. *Id.* She opined that Plaintiff's impairments would last or would be expected to last more than 12 months and his psychiatric condition exacerbated his pain and physical symptoms. *Id*. at 930. She found that Plaintiff was capable of low work stress as he became agitated in individual and group treatment if he would be challenged or stressed. *Id.* She opined that Plaintiff would miss work due to his impairments or treatment more than three times per month. *Id.*

On December 20, 2012, Plaintiff presented to Dr. Robb for follow up of his PTSD, aggression and anxiety. Tr. at 954. Plaintiff reported sleeping much better, less irritability and less panic attacks. *Id*. Dr. Robb noted that Plaintiff would need to retake the Depakote level "because he was off by 2 days before the test." *Id*. Plaintiff reported continued anxiety and PTSD symptoms over being shot and had poor concentration and conversation as he changed topics frequently. *Id*. He stated that he was afraid that he would be shot again by the people who shot him. *Id*. Dr. Robb

-22-

found Plaintiff to be cooperative, with a steady gait, logical and normal speech, a decreased recent and remote memory, average intelligence, no delusions or hallucinations, adequate judgment and good insight into his illness. *Id*. at 922. Dr. Robb diagnosed single episode major depressive disorder of moderate degree, panic disorder with agoraphobia and PTSD. *Id*. He rated Plaintiff's GAF at 56 and continued Trazadone, Paxil, Xanax and Depakote ER. *Id*.

On December 26, 2012, Dr. McMillen completed an agency form indicating that his most recent examination of Plaintiff was on December 5, 2012 and he treated Plaintiff once every two weeks. Tr. at 933. He diagnosed Plaintiff with thoracic and cervical nerve root lesions, sacroiliac sprain and strain and myalgia. *Id*. He indicated that Plaintiff's prognosis is guarded and he described his clinical and objective medical findings and treatment modalities and he indicated that Plaintiff's primary symptom was moderate pain rated at a 6 out of 10 in the neck, middle back and low back. *Id*. at 934. He opined that Plaintiff could sit and stand/walk for one hour each per eight-hour workday and could not sit or stand/walk continuously but would have to get up and move around every 30 minutes to 1 hour. *Id*. at 935. He estimated that Plaintiff could frequently lift and carry 0-5 pounds, occasionally lift and carry 5-20 pounds, but could never lift and carry over 20 pounds. *Id*. at 936. Dr. McMillen opined that Plaintiff had upper extremity limitations and his symptoms would increase if placed in a competitive work environment. *Id*. at 937. He stated that Plaintiff's pain or fatigue would constantly interfere with his attention and concentration and the impairments would last at least 12 months. *Id*. at 938. Dr. McMillen concluded that Plaintiff was capable of low work stress, but he needed to take unscheduled breaks every 2 hours for 15 minutes and Plaintiff had psychological limitations and could not pull, push, kneel, bend or stoop. *Id*. at 939.

On January 31, 2013, Plaintiff presented to Dr. Robb and reported that his mood was good and he was sleeping better, but he had two panic attacks a day and was sweating. Tr. at 951. He indicated that he was trying to go out with his friends more but he went bowling and had a panic attack. *Id*. Dr. Robb's examination revealed clear and normal speech, no new anger signs or signs of depression and no suicidal ideation. *Id*. at 952. Dr. Robb's prognosis of Plaintiff's condition was improvement with therapy. *Id*. He diagnosed single episode major depressive disorder of moderate

-23-

degree, panic disorder with agoraphobia and PTSD and rated Plaintiff's GAF at 56, indicative of moderate symptoms. *Id*. at 953. He refilled Plaintiff's prescriptions. *Id*.

On February 11, 2013, Dr. Ferrar wrote a letter indicating that Plaintiff was totally disabled without consideration of any drug and/or alcohol use as such use was not a material factor cause of Plaintiff's disability. Tr. at 942. She stated that Plaintiff was currently not using unprescribed drugs and/or alcohol and remained disabled. *Id*.

On February 18, 2013, Dr. Pakeeree completed a psychiatric/psychological impairment questionnaire indicating that she first treated Plaintiff on November 2, 2011 and last examined him on May 7, 2012 and met with him once every 2-3 months. Tr. at 943. She diagnosed Plaintiff with PTSD and recurrent major depression secondary to his medical condition. *Id.* She indicated his current GAF and highest GAF in the past year at 60. *Id*. Her prognosis for Plaintiff was guarded due to his physical conditions, chronic pain and psychosocial issues. *Id*. She checked the clinical findings of sleep and mood disturbances, emotional lability, social withdrawal or isolation, substance dependence, intrusive recollections of a traumatic experience, generalized persistent anxiety, and hostility and irritability. *Id*. at 943-944. She listed Plaintiff's primary symptoms as depression, anxiety and chronic pain and identified the most frequent and severe symptoms to be chronic pain and depression. *Id*. at 945. Dr. Pakeeree opined that Plaintiff was not limited or mildly limited in understanding, remembering and carrying out one or two-step instructions, carrying out detailed instructions, asking simple questions or requesting assistance, being aware of normal hazards and taking precautions. *Id.* at 946-948. She found Plaintiff moderately limited in understanding and remembering detailed instructions, maintaining concentration and attention for extended periods; and in making simple work-related decisions. *Id*. Dr. Pakeeree found Plaintiff markedly limited in: performing activities within a schedule or maintaining regular attendance; sustaining an ordinary routine without supervision; working with others or close to them without being distracted by them; interacting appropriately with the general public; maintaining socially appropriate behaviors; responding appropriately to changes in the work setting. completing a normal workday or workweek without interruption from psychologically-based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions

-24-

and responding appropriately to criticism from supervisors; getting along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; traveling to unfamiliar place or using public transportation; and in setting realistic goals or making plans independently. *Id.* She opined that Plaintiff's physical and mental impairments precluded him from working, the impairments would last or were expected to last more than 12 months and his psychiatric condition exacerbated his pain and physical symptoms. *Id.* at 948-949. She found that Plaintiff was incapable of even low work stress as he has chronic pain, high anxiety levels and is frequently irritable. *Id.* at 949. Dr. Pakeeree opined that Plaintiff would be absent from work due to his impairments or treatment more than three times per month. *Id.*

Dr. Johnston examined Plaintiff on March 25, 2013 and Plaintiff complained of a change in his bowel habits, pain with urination, and ringing in his ears. Tr. at 1000. Upon examination, Dr. Johnston noted that Plaintiff had no motor or sensory deficit and an appropriate mood and affect, and he referred Plaintiff for functional capacity testing. *Id.* at 1001.

Dr. Farrer examined Plaintiff on July 8, 2013 and Plaintiff reported feeling better. Tr. at 1011. They discussed ending his treatment within a few weeks. *Id.* His mood and affect were normal, he had mild depression and anxiety, no anger, normal activity and eye contact, clear speech, intact thought process and thought content and had fair judgment and insight. *Id.* Dr. Farrer's psychotherapy notes from March 4, 2013 through July 8, 2013 show reductions in depression, anxiety and anger with treatment. *Id.* at 1011-1027.

On July 9, 2013, Plaintiff underwent a functional capacity evaluation which identified decreased endurance, decreased ability to perform some functional tasks, reports of occasional diarrhea, right forearm pain, right upper leg, groin and right upper and lower quadrant abdominal pain, and occasional inconsistent/self-limiting effort. Tr. at 1036-1069. The occupational therapist indicated that Plaintiff had functional limitations and medical issues preventing him from returning to work as he could not stoop, squat or lift from floor to knuckle, he had difficulty sustaining a position or performing a repetitive task for prolonged periods of time, he is unable to stand, sit or

walk for prolonged periods of time, and he had pain, anxiety, decreased endurance, occasional diarrhea, PTSD and depression. *Id.* at 1060.

On August 8, 2013, Dr. Robb completed a psychiatric/psychological impairment questionnaire. Tr. at 962-966. He indicated Plaintiff's symptoms as depression, anxiety, suspiciousness and low concentration and memory and he identified the low concentration and memory as the most severe symptoms. Tr. at 963-966, 1088. He opined that Plaintiff was not limited or mildly limited in: understanding, remembering and carrying out one or two-step instructions; working with others or close to them without being distracted by them; interacting appropriately with the general public; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; responding appropriately to changes in the work setting being aware of normal hazards and taking precautions; and in setting realistic goals or making plans independently. *Id.* at 964-966, 1089-1091. He found Plaintiff moderately limited in: remembering locations and work-like procedures; sustaining an ordinary routine without supervision; making simple work-related decisions; and in getting along with co-workers or peers without distracting them or exhibiting behavioral extremes. *Id.* Dr. Robb found Plaintiff markedly limited in: understanding, remembering and executing detailed instructions; maintaining concentration and attention for extended periods; performing activities within a schedule or maintaining regular attendance; maintaining socially appropriate behaviors; completing a normal workday or workweek without interruption from psychologically-based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; and in traveling to unfamiliar places or using public transportation. *Id.*

Dr. Robb also wrote a letter indicating that Plaintiff could not perform full-time competitive work and his impairments would be expected to last more than 12 months. Tr. at 1057. Dr. Robb opined that Plaintiff was expected to have limited recovery and would have exacerbations and he was limited by anxiety and panic in small groups and had poor concentration and memory. *Id.* at 1071. Dr. Robb noted that Plaintiff's depression had improved. *Id.*

-26-

On January 23, 2014, Dr. Johnston completed a multiple impairment questionnaire form indicating that he first treated Plaintiff beginning on July 8, 2011 and most recently treated him on January 23, 2014, seeing him once every 3-6 months. Tr. at 1095. Dr. Johnston diagnosed Plaintiff with right abdominal pain, right forearm joint pain, right lower leg joint pain, limb soft tissue pain, unspecified neuralgia, neuritis and radiculitis, IBS/dumping syndrome, and PTSD. *Id.* He identified the clinical findings supporting his diagnoses and listed Plaintiff's primary symptoms as chronic diarrhea, pain in the abdomen, groin, arm and thigh, chronic fatigue associated with dumping syndrome, pernicious anemia and Vitamin D deficiency. *Id.* Dr. Johnston estimated that Plaintiff's pain level was an 8 of 10, his fatigue was 10 of 10, and Plaintiff could sit, stand/walk only up to 1 hour per eight-hour workday and would have to get up every 30 minutes. *Id.* at 1096-1097. Dr. Johnston recommended that Plaintiff not be required to stand/walk continuously, he could lift and carry only up to ten pounds occasionally, he had significant limitations in repetitive reaching, handling, fingering or lifting, he had marked limitation in grasping, turning and twisting objects with his right upper extremity, and he had moderate limitations in fine manipulations on the right side and in using his right arm for reaching overhead. *Id.* at 1098-1099. Dr. Johnston opined that Plaintiff's symptoms would increase if he were placed in a competitive work environment, his impairments would last or were expected to last more than one year, and emotional factors such as the inability to concentrate, anxiety and depression from PTSD would affect his work ability as well. *Id.* at 1100.

Dr. Johnston did indicate that Plaintiff was capable of low stress work, but he would have to take unscheduled breaks every thirty minutes to one hour, he had good days and bad days, and would miss more than three days per month from work due to his impairments or treatment. *Id.* at 1100-1101. Dr. Johnston commented that Plaintiff was not employable due to his multiple medical problems and he needed continuous pain management, psychiatry and gastrointestinal care. *Id.* at 1101.

On April 8, 2014, Dr. Johnston wrote a letter identifying Plaintiff's diagnoses and pains. Tr. at 1104. He opined that Plaintiff was not able to work and if he did, his pain and fatigue would frequently interfere with his ability to maintain concentration and attention. *Id.* Dr. Johnston

-27-

referred to his answers on the multiple impairment questionnaire and indicated that those answers remained accurate. *Id*.

On July 30, 2014, Dr. Johnston wrote another letter indicating Plaintiff's physical and mental symptoms and treatments and opining that Plaintiff does not tolerate stressful situations. Tr. at 1106. He indicated that a report from Plaintiff's psychiatrist would help determine the type of work that Plaintiff could tolerate and he opined that Plaintiff's physical and mental impairments were permanent conditions that would never go away. *Id*.

## B. TESTIMONIAL EVIDENCE

Plaintiff was twenty-six years old at the time of the hearing. ECF Dkt. #9 ("Supp. Tr.") at 1114. At the August 22, 2013 hearing before the ALJ, Plaintiff testified that he has a driver's license but has not driven since the shooting because he had increased anxiety and paranoia when he gets into the car to drive. Tr. at 1115. The ALJ noted diagnoses indicating that Plaintiff sustained gunshot wounds in the right hip, forearm, abdomen and pelvis, but one record said the wounds were from a shotgun and the other said they were from a BB gun. *Id*. at 1120. Plaintiff clarified that it was a double barrel 12 gauge shotgun and the remnants left were not BBs but were pellets from the shotgun. *Id*. at 1121.

Plaintiff and the ALJ reviewed Plaintiff's various impairments and Plaintiff indicated that before the shooting, he worked, but after the shooting, his stomach is always upset, he has stomach pain, constant sharp pain from his knee to his right groin area, his leg gives out and he has fractured it twice, and his dumping syndrome causes him to have to always be near a bathroom due to diarrhea. Supp. Tr. at 1124. He also reported that he does not feel safe going anywhere and basically stays home. *Id*. He further indicated that he also has right arm pain and had surgery on it, but 22 pellets still remain in it and he has reduced strength in the right hand as a result. *Id*. at 1125. Plaintiff described his right hip pain, indicating that the doctor told him that fecal matter is near that area and causes pain and blockages. *Id*. at 1126. He also related that he had a bowel resection in which they removed part of his intestines which caused the dumping syndrome. *Id*. at 1127.

Plaintiff opined that he could stand up to 15 minutes before his leg cramps and if he sits too long, his stomach and his back begin to hurt.  Supp. Tr. at 1129.  He stated that he could walk 20-30 feet at a time, he could sit up to 20 minutes, and he had difficulty bending, stooping and squatting.  *Id*. at 1130.  He indicated that prior to the shooting, he never had mental health care.  *Id*. at 1131.  He reported nightmares, crying spells, depression, isolation, and sadness that he no longer can go out with friends to a movie or he had to give up the machining job that he loved and took to follow in his father's footsteps.  *Id*. at 1132.

Plaintiff indicated that he lived with his parents, he tries to wash his clothes or cook food in the microwave, but he then forgets about them, and he cannot load the dishwasher or care for the cat litter boxes because he cannot bend.  Supp. Tr. at 1133.  Plaintiff also explained the circumstances surrounding the shooting and whether it was accidental, indicating that he originally thought it was as the shotgun discharged, as he stated that he was sitting across from the person who picked up the gun and it discharged.  *Id.* at 1134.  He reported, however, that while the person who picked the gun up called him afterwards and told him that it was an accident, that person put on Facebook that he had done it on purpose.  *Id.*

Upon questioning by Plaintiff's counsel, Plaintiff reported that he uses the bathroom 15 or more times per day due to his chronic diarrhea.  Supp. Tr. at 1134.  He indicated that when he has to go to the bathroom, he has to get to the bathroom as quickly as he can and he has had accidents both away from home and at home.  *Id*. at 1135.  He reported poor energy and gets B-12 shots twice per month, which no longer help and he feels most comfortable laying down and putting either heat or ice on his body.  *Id*. at 1136.  He indicated that on an average day since he was shot, he lays down four to five hours per day of an eight-hour day.  *Id.*  He noted that before he was shot, he was up all day and worked fifty to sixty hours per week.  *Id.*  He noted that he has trouble holding onto items due to nerve damage in his right arm and hand.  *Id.*  Plaintiff reported that the remaining 22 pellets are being rejected by his body and causing problems, but doctors will not operate until the pellets pop through his skin and resurface because more damage would be caused to try and get all of them out at the present time.  *Id.* at 1138.  Plaintiff also indicated that he sees a counselor one time per

-29-

week which helps him and the medications that he takes do not help him sleep much and he still has panic attacks at least every other day. *Id*. at 1139-1140.

The VE then testified. The ALJ asked the VE to assume a hypothetical individual with the same age, education and background as Plaintiff, with a light work limit and: no climbing ladders, ropes or scaffolds; occasionally climbing ramps and stairs; occasional stooping, crouching or crawling; understanding, remembering and carrying out simple instructions; performing simple, routine tasks; DOT reasoning levels of 1 through 3; performing low-stress work that does not subject him to strict quotas or fast-placed high production demands; work not requiring negotiation, arbitration and confrontation, directing the work of others or being responsible for the safety of others; the ability to adjust to only infrequent workplace changes; only superficially interaction with the public and occasional contact with co-workers. Supp. Tr. at 1142-1143. The VE responded that the hypothetical individual could not perform Plaintiff's past relevant work but could perform a number of other jobs existing in significant numbers in the national economy, including the representative jobs of a mail clerk, cafeteria worker, or packager. *Id*. at 1143-1144.

The ALJ presented a second hypothetical individual to the VE, asking the VE to assume the same hypothetical individual as the first, but with a need to work near restroom facilities. Supp. Tr. at 1144. The VE responded that such an individual would require an accommodation and therefore no jobs existed for such an individual. *Id.*

Plaintiff's counsel then modified the ALJ's first hypothetical, adding a limitation to only occasional grasping, twisting and turning of objects with the dominant hand right upper extremity rather than frequent and constant manipulation of that sort. Supp. Tr. at 1144-1145. The VE indicated that the jobs he identified would be excluded, but other jobs would be available with an occasional manipulation limitation. *Id*. at 1145. When counsel asked if such a hypothetical individual could perform any jobs with a less than occasional manipulative limitation, the VE responded that no jobs existed for such an individual. *Id*. When counsel presented a hypothetical individual with pain, frequent restroom use, and a need to take breaks because of fatigue which rendered him off task 20% of the workday, the VE responded that such a person could not sustain full-time work in any of the sample jobs that were given. *Id*. at 1146.

-30-

The ALJ added to his first hypothetical individual an additional limitation to occasional fine and gross manipulation, fingering and handling and asked the VE if jobs were available for such a person.  Supp. Tr. at 1146.  The VE responded that many jobs existed for such an individual, including the representative jobs of counter clerk, bakery worker, gate guard, and information clerk. *Id*. at 1147, 1150.  When the ALJ asked if any jobs existed for the hypothetical individual if the exertional level was changed to a sedentary level with the same limitations, the VE responded that no jobs existed.  *Id*.

## VI.  LAW AND ANALYSIS

### A.  TREATING PHYSICIANS' OPINIONS

Plaintiff first alleges that the ALJ committed error in failing to properly evaluate and explain the weights that he attributed to the opinions of Dr. Johnston, Plaintiff's treating physician, Dr. Meehan, Plaintiff's treating chiropractor, Dr. Farrer, Plaintiff's treating psychologist, and Drs. Pakeeree and Robb, Plaintiff's treating psychiatrists.  ECF Dkt. #13 at 22-30.  For the following reasons, the undersigned recommends that the Court find that the ALJ provided inadequate reasons for applying little weight to the opinions of Drs. Johnston, Dr. Farrer, Dr. Pakeeree and Dr. Robb.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security.  Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians.  SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004). A presumption exists that the opinion of a treating physician is entitled to great deference.  *Id.*; *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007).  If  that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.  When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion:  the length, frequency, nature, and extent of the

treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Commissioner of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. Apr.28, 2010). For example, where an ALJ failed to describe "the objective findings that were at issue or their inconsistency with the treating physician opinions," remand has been ordered. *Barrett v. Astrue*, 2011 WL 6009645, at *6 (E.D.Ky. Dec.1, 2011). The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. March 15, 2011) (quoting *Rogers*, 486 F.3d at 243 ).

In this case, the undersigned notes that the record consists of approximately 800 pages of medical reports and records. Tr. at 297-1105. As the ALJ points out, numerous duplicates of the medical records were provided, making it more difficult to sift through the record. *Id.* at 13. However, the record contains a total of 9 medical source statement and opinion letters from Plaintiff's treating sources, including notes, statements and letters from Dr. Muakkassa, Dr. Burick, Dr. Johnston, Dr. McMillen, Dr. Farrer, Dr. Robb, and Dr. Pakeeree. *Id.* at 421-422, 423-424, 605-606, 620, 649, 653, 724, 727, 874-881, 925-931, 943-950, 1095-1101, 1101-1104, 1106. The record also includes a report from an occupational therapist. *Id.* at 1059-1069. As to each and every one of these opinions, the ALJ attributed "little weight." *Id.* at 22-26.

Here, Plaintiff only challenges the ALJ's decision to give "little weight" to the opinions of Drs. Johnston, Meehan, Farrer, Pakeeree, and Robb. The undersigned addresses the medical source statements and opinions of each challenged treating source in turn.

### 1.     DR. JOHNSTON

Dr. Johnston, Plaintiff's primary treating physician, provided statements on July 8, 2011, December 20, 2011, and August 13, 2012. Tr. at 23-25, 605-606, 653, 874-881. He also provided opinions on January 23, 2014, April 8, 2014 and July 30, 2014, which post-date the ALJ's decision and reaffirms his prior opinions and provide updated medical information. *Id.* at 28, 1095-1101, 1101-1104, 1106. Dr. Johnston's July 8, 2011 letter indicates that he first treated Plaintiff on that date and he indicated diagnoses for Plaintiff of abdominal pain due to gunshot wound, dumping syndrome due to abdominal partial bowel resection, pain in joint and forearm due to gunshot wound, associated neuralgia and neuritis, and multiple pellets still located in wound. *Id.* at 605. Dr. Johnston described Plaintiff's treatment and medication regimen and indicated the medications that he prescribed for Plaintiff on that date. *Id.* at 606. He further noted that he would be treating Plaintiff every 1-2 months, Plaintiff's prognosis was poor and would last beyond 12 months, and Plaintiff's activities were limited due to constant pain, dumping syndrome, anxiety, and depression due to an inability to work and lead a normal life. *Id.* Dr. Johnston further indicated that Plaintiff's right thigh pain with steps and walking, the giving out of his leg, his right arm pain, and his limited abilities to push, pull and lift, also limited his activities. *Id.* Dr. Johnston further noted that the labs

-33-

were performed through Plaintiff's pain management provider, psychiatric provider and the tests and surgeries that Plaintiff underwent preceded the beginning of his treatment with Plaintiff. *Id.*

On December 20, 2011, Dr. Johnston provided his opinion in a "To Whom it May Concern" letter in which he opined that Plaintiff would not be able to return to work for at least a year due to anxiety, depression, right arm pain and weakness due to his gunshot wounds and surgery, and IBS or dumping syndrome due to bowel resection also caused by the gunshot wound. Tr. at 653.

On August 13, 2012, Dr. Johnston completed a multiple impairment questionnaire and identified Plaintiff's diagnoses as PTSD, abdominal pain, IBS, pain in the lower leg and forearm joints and in soft limb tissues, unspecified neuralgia, neuritis and radiculitis, and anxiety and depression. Tr. at 874. He listed the clinical findings and laboratory and diagnostic test results that supported his diagnoses, and he opined that Plaintiff: could sit for up to four hours; could stand/walk up to two hours; had to get up and move around every 15 minutes; could occasionally lift and carry up to ten pounds; had significant right arm and hand limitations; would frequently experience pain, fatigue or other symptoms severe enough to interfere with his attention and concentration; had emotional factors that would contribute to the severity of Plaintiff's limitations and symptoms; and Plaintiff would need to take unscheduled breaks of thirty to sixty minutes at unpredictable levels in an eight-hour workday. *Id.* Dr. Johnston further opined that Plaintiff needed ready access to a bathroom, had psychological limitations, and could not push, pull or bend. *Id.* at 880.

In attributing little weight to Dr. Johnston's December 20, 2011 opinion, the ALJ reasoned that he provided vague and conclusory opinions that were unsupported by his treatment notes that showed infrequent and conservative treatment and no diagnosis of dumping syndrome. *Id.* at 23, citing Tr. at 653. The ALJ also noted that treating physician's opinion that a claimant is disabled is not deserving of any special significance under the Social Security Regulations. *Id.* at 24.

The ALJ is correct that Dr. Johnston's opinion concerning whether Plaintiff is disabled is not entitled to any special significance. 20 C.F.R. §404.1527(d)(3); 20 C.F.R. §416.927(d)(3). However, the ALJ's reasoning that Dr. Johnston's treatment notes showed infrequent and conservative treatment is not supported by the record. Plaintiff did not infrequently treat with Dr.

-34-

Johnston as the record shows that he met with Dr. Johnston quite frequently, including appointments on July 8, 2011, July 15, 2011, July 26, 2011, August 30, 2011, September 27, 2011, and December 8, 2011, all prior to Dr. Johnston's medical source statement. Tr. at 739-748, 752-754. He also continued his treatment with Dr. Johnston and had appointments on January 27, 2012, March 1, 2012, and March 8, 2012, October 23, 2012, December 3, 2012, and March 25, 2013. *Id.* at 731-734, 739-740, 1000-1005. Moreover, Dr. Johnston is Plaintiff's primary care physician, who, in addition to following up with Plaintiff and providing some treatment, referred Plaintiff to specialists during this time, including a gastroenterologist, pain management specialists, and mental health specialists. *Id.* at 731-744, 749, 865-873. During the time period preceding Dr. Johnston's opinions, Plaintiff underwent an ileocecectomy, resection of his ileum, closure of the peritoneum at the entrance site, incision and drainage of the entrance wound of the bullet to the right groin, and incision and drainage with closure of the right forearm gunshot wound on July 4, 2010. *Id.* at 396. It was noted that Plaintiff had "multiple areas of significant injury to the small bowel with about 80% circumference loss of tissues in approximately 6 places." *Id.* at 397. On February 10, 2011, Plaintiff underwent surgery to excise and remove 14 gunshot pellets from his right forearm with one large and two punctate incisions, and 2 gunshot pellets from his right groin through 5 incisions and 2 punctate incisions. *Id.* at 450, 463-464. He had also been prescribed Percocet as needed every six hours, Nerontin of 100 milligrams four times per day, Opana ER and Lidoderm patches. *Id.* at 582, 609, 658. He had undergone trigger point injections to his abdominal wall and his right shoulder and arm. *Id.* at 595, 656. Thus, while Dr. Johnston's care was limited to follow up care, medication prescription and trigger point injections, he treated with Plaintiff frequently and he did send Plaintiff to specialists for more intensive treatment and Plaintiff underwent more than conservative treatment after sustaining the gunshot wounds.

The ALJ also attributed little weight to Dr. Johnston's opinions because there was no diagnosis of dumping syndrome. Tr. at 24-25. The undersigned also finds that this reason for attributing little weight to the opinions is insufficient. In his July 8, 2011 statement, Dr. Johnston did diagnose dumping syndrome. *Id.* at 605. He noted that Plaintiff had dumping syndrome due to the abdominal partial bowel resection. *Id.* However, Dr. Johnston also indicated in his December

-35-

20, 2011 statement that Plaintiff had IBS or dumping syndrome.  *Id.* at 653.  IBS was in fact also diagnosed.  *Id.* at 622.  Nevertheless, whether Dr. Johnston diagnosed dumping syndrome or IBS is not a valid basis for attributing little weight to his opinion, especially since the diagnoses of both have some support in the record.

As to Dr. Johnston's August 12, 2012 opinion, the ALJ also attributed to it little weight, finding that it was not consistent "with the above-reports showing improvement of both physical and mental symptoms through routine and conservative treatment", and reasoning that opinions from treating physicians concerning whether a claimant is disabled are reserved to the Commissioner and not entitled to special significance.  Tr. at 24.  Again, the latter reason is correct as treating physician opinions as to whether a claimant is disabled are entitled to no special significance.  However, the only report that the ALJ specifically cites to in the record for allegedly showing improvement in Plaintiff's symptoms through routine and conservative treatment is a treatment record of a follow-up visit by Plaintiff to his pain management specialist who indicated that Plaintiff rated his right upper leg, abdominal and right forearm pain at a 9 out of 10 and described the pain as shooting, throbbing, sharp and stabbing.  *Id.* at 916-917.  Upon examination, Plaintiff was positive for abdominal pain and musculoskeletal pain, he had tenderness to palpation, abnormal ankle range of motion and he reported bouts of diarrhea due to IBS and that his current pain management regimen was not working appropriately.  *Id.* at 917.  Without further identification of the "above-reports" and the medical records showing Plaintiff's treatments, surgeries, and referrals to specialists, the ALJ has not provided an adequate basis for attributing less than controlling weight to this opinion.

For these reasons, the undersigned recommends that the Court find that the ALJ has not sufficiently evaluated Dr. Johnston's opinions under the treating physician rule and substantial evidence does not support the ALJ's decision to attribute little weight to those opinions.

### 2.    DR. MEEHAN

Plaintiff also challenges the ALJ's treatment of the opinions of chiropractor Dr. Meehan. ECF Dkt. #13 at 25-26.  Plaintiff concedes that as a chiropractor, Dr. Meehan is not considered an "acceptable medical source" under the Social Security Regulations, although the ALJ did not use

that Regulation to attribute little weight to his opinion.  *Id*. at 25, citing 20 C.F.R. § 404.1512, 404.1527(a)(2), 416.912, 416.927(a); *see also* Tr. at 24-25.

In attributing little weight to Dr. Meehan's opinion, the ALJ concluded that it was inconsistent with the medical records showing that Plaintiff had increased and normal strength in his extremities, a normal gait, and otherwise unremarkable examinations. Tr. at 25.  As support for his reasoning, the ALJ cited to a range of treatment records from the pain management clinic, some of which showed that Plaintiff had normal ranges of motion and strength, and his reports that his pain was controlled with the medication regimen that he was prescribed.  *Id*. at 908, 910-911. However, other records in the same subset from the pain management clinic also showed positive abdominal pain, positive myalgia and arthaligia, a report that on August 29, 2012, Plaintiff's right leg gave out and he fell down stairs 2-3 feet and fractured his right tibia.  *Id*. at 914.  He was ambulating with crutches.  *Id*. at 912.  Further, Dr. Meehan's December 26, 2012 medical source statement cited to Plaintiff having spasms from C1-C7, T1-8 and L1-5, and restricted C2, C6, T3, T6, T7, L5 and right sacroiliac joint ranges of motion.  *Id*. at 933.

While the records cited to by the ALJ to support the weight that he gave Dr. Meehan's opinion contain both consistent and inconsistent evidence, and Dr. Meehan's report outlined an opinion consistent with his findings, the fact that Dr. Meehan is not considered an acceptable medical source, coupled with the substantial evidence standard, leads the undersigned to recommend that the Court find that substantial evidence supports the ALJ's decision to give little weight to this opinion.

### 3.    DRS. PAKEEREE, ROBB AND FERRAR

Plaintiff further challenges the ALJ's decision to attribute less than controlling weight, and in fact, little weight, to the opinions of his treating psychiatrists, Drs. Pakeeree and Robb, and his treating psychologist, Dr. Farrer.

The ALJ reviewed Dr. Pakeeree's February 18, 2013 impairment questionnaire and gave great weight to the mild and moderate limitations that she opined.  Tr. at 25.  However, the ALJ attributed little weight to the marked limitations that she opined for Plaintiff in the four of eight

categories of sustained concentration and persistence, four of five categories of social interaction, and three of four categories of adaptation. *Id*. He also gave little weight to her opinions that Plaintiff's physical and mental impairments would preclude him from working even in low stress environments and he would miss work more than three times per month due to his impairments and treatment. *Id*. The only reason for attributing little weight to the marked limitations that Plaintiff's treating psychiatrist opined for him was because "they were not consistent with the claimant's routine and conservative treatment showing improved symptoms and being stable for most of the time." *Id*.

In reviewing the opinion of Dr. Farrer, Ph.D., who opined that Plaintiff was moderately limited in understanding and memory and in adaptation skills, the ALJ gave these parts of the opinion great weight, explaining that they were consistent with the record as a whole and her treatment notes which suggested only moderate depression and anxiety. Tr. at 24. However, the ALJ gave little weight to Dr. Farrer's opinion that Plaintiff was markedly limited in five of eight concentration, attention and persistence categories and two of five social interaction categories on the impairment questionnaire. *Id*. He also attributed little weight to her opinion that Plaintiff would likely be absent from work more than three times per month due to his impairments or treatments. *Id*. The ALJ reasoned that these opinions were not "consistent with the treatment records showing a decrease in symptoms over time." *Id*.

As to Dr. Robb's opinions on August 8, 2013, the ALJ gave great weight to those portions of the opinion suggesting mild to moderate limitations, but he gave little weight to Dr. Robb's opinion that Plaintiff was markedly limited in three out of eight sustained concentration and persistence categories. Tr. at 26. The ALJ explained that he attributed little weight to the severe limitation portions of Dr. Robb's opinion and the opinion that Plaintiff would miss more than three days of work per month because the opinions "were not consistent with the claimant's routine and conservative treatment showing improved symptoms and being stable for most of the time." *Id*. The ALJ attributed little weight to Dr. Robb's opinion that Plaintiff could not perform full-time competitive work due to expected exacerbations, anxiety, poor concentration and memory because

that opinion was not consistent with treatment notes showing no more than mild symptoms and this was an opinion on disability, which was entitled to no special significance.  *Id.* at 26.

Dr. Pakeeree diagnosed Plaintiff with recurrent major depression and PTSD.  Tr. at 943.  She noted that she treated Plaintiff once every 2-3 months and she identified depression and chronic pain as Plaintiff's most severe and frequent symptoms.  *Id.* at 945.  She noted that Plaintiff had high anxiety levels and was frequently irritable, which rendered him incapable of even low stress activities.  *Id.* at 949.  She identified emotional lability, sleep disturbance, social withdrawal, intrusive recollections of a past experience, generalized persistent anxiety, hostility and irritability as findings supporting her diagnoses and she indicated that Plaintiff's physical and mental impairments prevented him from working as he would likely deteriorate or decompensate in a work setting which would cause him to withdraw from that situation or experience the exacerbation of his symptoms.  *Id.* at 948.  She found Plaintiff markedly limited in performing activities within a schedule or maintaining regular attendance or punctuality, sustaining an ordinary routine without special supervision, working near or with others without being distracted by them, completing a normal workweek or performing at a consistent pace without interruptions from psychologically-based symptoms, interacting appropriately with general public, accepting instructions and responding appropriately to criticism from supervisors, getting along with others without distracting them or exhibiting behavioral extremes, and in maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness.  *Id.* at 946-947.

Dr.Robb diagnosed Plaintiff with major depressive disorder, panic disorder with agoraphobia, and PTSD.  Tr. at 958.  His treatment notes showed that Plaintiff had symptoms of PTSD, hyperviligance and panic.  *Id.* at 922.  He indicated on December 20, 2012 that Plaintiff had a sad affect, tension and significant depression.  *Id.* at 955.  He also noted Plaintiff's poor concentration and his changing of topics of conversation frequently.  *Id.* at 954.  Dr. Robb indicated that Plaintiff's most severe and frequent symptoms were low concentration and memory.  *Id.* at 963.  He also reported that Plaintiff had anxiety and panic with sweating, especially in groups.  *Id.* at 953.  He listed Plaintiff's primary symptoms as depression, anxiety, suspicion of being hurt and low concentration and memory, and he opined that Plaintiff would be absent more than three times per

month due to his impairments and treatment.  *Id*. at 966.  He found Plaintiff markedly limited in understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, performing activities within a schedule and maintain regular attendance, making simple work-related decisions, and in completing a normal workweek or performing at a consistent pace without interruptions from psychologically-based symptoms.  *Id*. at 966.

Dr. Farrer diagnosed PTSD and severe major depressive disorder without psychotic features and polysubstance abuse in full remission. Tr. at 925.  Her treatment notes indicated that Plaintiff's anxiety was severe and his mood and affect were severe at the August 27, 2012 evaluation. *Id*. at 898.  She indicated in her impairment questionnaire that Plaintiff's primary symptoms were anger/irritability, memory problems and concentration problems. *Id*. at 927.  She noted that at their November 5, 2012 therapy session, Plaintiff had done more work than she had requested, so they discussed concentrating on less than what was asked of him.  *Id*. at 886.  She noted on October 29, 2012 that Plaintiff had trouble staying in the present tense.  *Id*. at 888.  On October 8, 2012, she noted that Plaintiff was late for his session and had lost the documents that she had given him at the prior session.  *Id*. at 892.  Plaintiff was also late for his second and third sessions.  *Id*. at 899-901.  At his first session, Dr. Farrer noted that Plaintiff spent a lot of time working on the paperwork because of memory problems.  *Id*. at 902.   In her impairment questionnaire, Dr. Farrer noted poor memory, sleep disturbance, mood disturbance, social withdrawal, decreased energy, recurrent panic attacks, anhedonia, hostility and irritability, difficulty thinking or concentrating, and suicidal ideation or attempts.  *Id*. at 926.  She found Plaintiff markedly limited in maintaining attention and concentration for extended periods, sustaining an ordinary routine without special supervision, working near or with others without being distracted by them, making simple work-related decisions, completing a normal workweek or performing at a consistent pace without interruptions from psychologically-based symptoms, accepting instructions and responding appropriately to criticism from supervisors, and getting along with others without distracting them or exhibiting behavioral extremes.  *Id*. at 929.

The common thread of Drs. Pakeeree, Robb and Farrer's opinions relate to Plaintiff's marked limitations in concentration and persistence and social interaction, the opinion that Plaintiff would miss at least three days per month of work due to his impairments and treatment, and Plaintiff's inability to sustain full-time employment stressors.  Tr. at 928-931, 946-950, 964-966, 1089-1093.  Each of these mental health professionals who treated Plaintiff on a regular basis in the same time period came to similar conclusions concerning Plaintiff's ability to concentrate and persist, his ability to tolerate stress, and his predicted absences from work due to his impairments and treatment.  The ALJ provided no citations to the records upon which he based his determination that these  opinions were entitled to only little weight.  He merely generically stated that Plaintiff's symptoms improved over time and the medical opinions "were not consistent with the claimant's routine and conservative treatment showing improved symptoms and being stable for most of the time."  Without citations to improvements or a showing in the record of inconsistencies or other support for his determinations, the undersigned recommends that the Court find that the ALJ has failed to adequately apply the treating physician rule and substantial evidence is lacking for his determination to attribute little weight to the opinions of Drs. Pakeeree, Robb and Farrer.  Moreover, even if Plaintiff's symptoms did improve, "'improvement' is a relative concept."  *McQueen v. Comm'r of Soc. Sec.*, No. 1:13-cv-88, 2014 WL 533496 (S.D. Ohio Feb. 11, 2014), citing *Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 Fed. App'x 488, 494 (6th Cir. 2011)("The ALJ made no inquiry into the degree of improvement, or from what baseline Plaintiff had improved.  Under the ALJ's logic, any improvement in one's mood, regardless of how small and from what level the individual improved, would defeat a claim of mental impairment.  This cannot be so.").

### C.    ALJ'S CREDIBILITY AND RFC DETERMINATIONS

Plaintiff also asserts that the ALJ's credibility and RFC determinations are erroneous and unsupported by substance evidence.  ECF Dkt. #13 at 26-34.  Since the undersigned has recommended that the Court reverse and remand this case to the ALJ for reconsideration and more articulation as to his findings regarding the opinions of Drs. Johnston, Pakeeree, Robb and Farrer, the undersigned refrains from ruling on the issue of Plaintiff's credibility and the alleged erroneous

RFC determination because the opinions and RFCs of these treating physicians, psychiatrists and psychologist may play a role in these redeterminations.

## VII.  RECOMMENDATION AND CONCLUSION

Based upon a review of the record, the Statements of Error and the law and analysis provided above, the undersigned recommends that the Court DENY Plaintiff's motion for summary judgment (ECF Dkt. #12).  However, the undersigned further recommends that the Court REVERSE the ALJ's decision and REMAND this case for reconsideration, reevaluation and more thorough articulation by the ALJ of his decisions to attribute only little weight to the opinions of Drs. Johnston, Pakeeree, Robb and Farrer, Plaintiff's treating physician, psychiatrists and psychologist, should he again choose to do so.


DATE: April 29, 2016                           ___/s/George J. Limbert_____
                                              GEORGE J. LIMBERT
                                              UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. L.R. 72.3(b).